UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KENNETH NICHOLSON,

                Plaintiff,

v.

                Case # 13-CV-6072-FPG-MWP

                DECISION AND ORDER

BRIAN FISCHER, et al.,

                Defendant.

## INTRODUCTION

Plaintiff Kenneth Nicholson ("Plaintiff") brings this Eighth Amendment action pursuant to 42 U.S.C. § 1983 ("Section 1983") against three employees of Wende Correctional Facility: Corrections Officer James Johnson ("Johnson"), Corrections Officer Jason Barrett ("Barrett"), and Deputy Superintendent of Security Thomas J. Sticht ("Sticht"). ECF No. 38.[1] On January 5, 2018, Defendants Sticht and Barrett moved for summary judgment. ECF No. 95. For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND[2]

In October 2012, Plaintiff, then an inmate at Sing Sing Correctional Facility, had a physical fight with two inmates belonging to the Bloods gang. The inmates slashed Plaintiff across the face with a sharp object. Plaintiff told prison officials that the men assaulted him because he dropped out of the Bloods. ECF No. 102-1 at 14. To separate him from his attackers, Sing Sing officials placed Plaintiff in involuntary protective custody and decided to transfer him to Wende

---

[1] Plaintiff's Second Amended Complaint ("SAC") is the operative complaint. The SAC listed additional defendants who have since been dismissed from this case. *See* ECF No. 66 at 1.

[2] The following facts are undisputed and are taken from each party's Statement of Material Facts. ECF Nos. 95-1, 102-2.

1

Correctional Facility in January 2013. The New York State Department of Corrections and Community Supervision's ("DOCCS") Office of Classification and Movement in Albany, New York, which is responsible for transferring and classifying roughly 50,000 inmates among more than 50 different correctional facilities, determined that Plaintiff's transfer to Wende was appropriate and that Plaintiff was eligible to share a cell with another inmate at Wende—a practice DOCCS refers to as "double bunking."

According to Defendant Sticht, who was responsible for overseeing all aspects of security at Wende, once Plaintiff "was transferred, he was no longer in protective custody" and his "involuntary protective custody status . . . did not follow him to Wende Correctional Facility." ECF No. 95-1 at 3. Plaintiff, on the other hand, stated that his protective custody status followed him to Wende and that he was supposed to be isolated so that authorities could interview him and determine if he had any enemies before placing him in a double bunk cell with another inmate. ECF No. 102-1 at 25. In any event, no one interviewed Plaintiff immediately upon his arrival at Wende; rather, he was placed into a double-bunk cell with another inmate, Michael Williams. According to Sticht, "[p]lacement of incoming inmates in cells at Wende CF is made by random selection of available cells. Both inmates were deemed eligible for double bunking and randomly selected for the cell." *Id.* at 21.

Williams had a history with the Bloods. Specifically, a form documenting his initial interview at Wende, dated January 7, 2013, states that he had a disciplinary history of gangs and violence, and his security assessment form, dated January 1, 2013, states that he was a member of the Bloods. *See id.* at 8. Furthermore, one month before Williams was placed in a cell with Plaintiff, officials placed him in the Special Housing Unit ("SHU") for four months because of gang activity. *Id.* Plaintiff also had a documented history of gang involvement: paperwork from

his guidance file, which was accessible to Wende officials, indicated that Plaintiff was a former Bloods member and had enemies and prior gang-related charges. *Id.* Plaintiff's guidance file also revealed that Plaintiff previously transferred from Great Meadow Correctional Facility in 2011 because prison staff "believed that a portion of [the] inmate population [knew] that [Plaintiff] had provided confidential information to prison security regarding Bloods activity." *Id.* at 10.

On January 16, 2013, Williams returned to his cell after lunch and threatened to "blow [Plaintiff's] face off" unless Plaintiff asked a corrections officer to move him to a different cell. ECF No. 38 at 15. According to Plaintiff, he immediately left the cell and told Defendant Barrett, who was performing rounds in Plaintiff's cellblock, about Williams's threat. According to Barrett, however, Plaintiff told him that he could no longer live in his cell but refused to tell him why. In any case, all parties agree that Barrett then locked Plaintiff in the shower to secure him and notified his supervisor, Defendant Johnson, of the situation with Williams so that Johnson could investigate. Johnson asked Williams what would happen if he did not move Plaintiff to a new cell, to which Williams responded: "it will be what it is going to be" and that he "would handle his business." ECF No. 102-1 at 9. Johnson moved Williams into a different cell, but Plaintiff heard Johnson joke to Barrett that they should have put Plaintiff back in the cell with Williams and let them "beat the shit out of each other and the best man keeps the cell." *Id.* Neither Barrett nor Johnson made any written notation of the incident. Plaintiff did not ask anyone at Wende to place him in protective custody and nobody offered him protective custody.

According to Wende counselor Robert Skubis, new inmates are supposed to be housed separately from other inmates until a sergeant or higher ranked official conducts a security interview to determine if the new inmate is suitable for general population housing. ECF No. 102-

3

13. According to Defendant Johnson,[3] that initial interview should occur within the first three days of an inmate's arrival. ECF No. 102-1 at 10. No one interviewed Plaintiff until January 20, 2013—five days after he arrived at Wende and several days after his altercation with Williams. Plaintiff's paperwork from that interview indicates that he was involved in gang activity but did not identify any known enemies. *Id.* at 6. The next day, Counselor Skubis interviewed Plaintiff, who alleges that he told Skubis "about his prior altercation with Williams in his cell" and that Williams was in the same prison orientation class with him. *Id.* at 11. Skubis's paperwork documenting that interview indicates that Plaintiff had enemies, but does not mention Williams. ECF No. 95-5 at 4. The form, which Plaintiff signed, reveals that Plaintiff had no concerns for his personal safety. *Id.*

On January 23, 2013, Plaintiff, Williams, and 19 other inmates attended an orientation session in an unsupervised classroom. According to Defendant Sticht, because the orientation program is a "peer run program" that is run by a fellow inmate and not a staff instructor, it "is common to have the inmates in the room without an officer physically present in the room." ECF No. 103-1. During the orientation, Williams and another inmate named Martinez began stabbing Plaintiff with a homemade knife. Williams and Martinez stabbed Plaintiff at least nine times over the course of five to seven minutes, and Plaintiff suffered puncture wounds on both of his hands, his right shoulder, and the back of his head. Plaintiff eventually escaped and alerted a corrections officer, who was posted more than 25 feet away. Officials took Plaintiff to Erie County Medical Center for treatment.

On February 12, 2013, after Plaintiff refused to voluntarily enter protective custody, Wende officials held a hearing to determine if Plaintiff should be placed in involuntary protective custody.

---

[3] Defendant Johnson has not moved for summary judgment.

4

During the hearing, Defendant Sticht acknowledged that Plaintiff's "previous record shows prior [involuntary protective custody] placements and gangs," and decided to place Plaintiff in involuntary protective custody.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Sousa v. Roque*, 578 F.3d 164, 169 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id*. The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court resolves all ambiguities and draws all factual inferences in the nonmovant's favor, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56).

To defeat summary judgment, therefore, nonmoving parties "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and they "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted). At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir.1998).

## II. Direct Liability Under the Eighth Amendment

Plaintiff argues that Defendants Barrett and Sticht violated the Eighth Amendment by failing to protect him from Williams and Martinez's attack. The Eighth Amendment protects prisoners from cruel and unusual punishment. *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). It also imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 822 (1994). Officials are not liable for "every injury suffered by one prisoner at the hands of another." *Id.* at 834; *see also Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (explaining that Eighth Amendment liability "entails something more than mere negligence").

Instead, to prove that an official violated the Eighth Amendment, the injured inmate must show that 1) "he is incarcerated under conditions posing a substantial risk of serious harm," and 2) the prison official acted with "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 834. An official acts with deliberate indifference when he " knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. The U.S. Supreme Court set forth a subjective, as opposed to objective, standard for deliberate indifference because "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of [cruel and unusual] punishment" under the Eighth Amendment. *Id.* at 838.

The Court need not determine if Plaintiff satisfied the first part of the Eighth Amendment's two-part test—whether he was incarcerated under conditions posing a substantial risk of serious

harm—because he has not adduced any evidence to establish that Defendants Barrett or Sticht were deliberately indifferent to his health or safety.

   i.   **Defendant Barrett**

Barrett denies that he was deliberately indifferent to Plaintiff's safety because Plaintiff never told him about Williams's threat and, "more important[ly]," Barrett's actions on the day of the verbal altercation between Williams and Plaintiff would have been the same regardless of whether he knew that Williams threatened Plaintiff. Plaintiff argues that Barrett knew about Williams's threat, and that Barrett's failure to document the verbal dispute between them or to ensure that Plaintiff received protective custody after the incident amounted to deliberate indifference.

Plaintiff's arguments fail for multiple reasons. First, Barrett did not have "authority to conduct investigations" or to "offer an inmate protective custody." ECF No. 95-2. After locking Plaintiff in the shower when he refused to return to his cell with Williams, Barrett did what he was "supposed to" do by notifying his supervisor, Defendant Johnson, "of the situation so that he could investigate." ECF No. 95-2. Plaintiff emphasizes the fact that Barrett "simply . . . called his supervisor and left the scene, rather than logging the incident, as required by DOCCS Directive." ECF No. 102-1 at 5. DOCCS rules, however, did not require Barrett to log the incident. Rather, DOCCS Directive Number 4091 provides that officers should log "fights" or other "unusual incidents." *Id.* at 27. Using his discretion, which DOCCS rules allow corrections officers to do, Barrett decided that a verbal disagreement between inmates was not an "unusual incident" that merited documentation.

Secondly, Plaintiff unduly focuses on the fact that Barrett did not record the incident in the logbook. After refraining from documenting the incident between Williams and Plaintiff, Barrett

did not simply abandon the scene or otherwise fail to act. Far from disregarding any risk to Plaintiff's safety, Barrett secured Plaintiff in a location that was outside of Williams's reach and notified Defendant Johnson of the situation. Johnson, unlike Barrett, had authority to investigate the altercation and take corrective action, which he did by moving Williams to a new cell. Whether Johnson's actions were sufficient to protect Plaintiff is not currently before the Court on this motion. The record indicates that Barrett's reliance on his supervisor was fully reasonable, and Plaintiff has not rebutted that conclusion. Plaintiff clearly disagrees with Barrett's decision, but he cannot explain how it was deliberately indifferent or even negligent. Summary Judgment is therefore GRANTED as to Defendant Barrett.

    ii.    **Defendant Sticht**

Plaintiff argues that, because Defendant Sticht was "responsible for overseeing all aspects of security at" Wende and had access to documents establishing Plaintiff's history with the Bloods, even a "cursory review of documents available to Sticht would have revealed that [Plaintiff] had a history of being attacked by members of the Bloods gang and should not have been placed in general population with Williams." *Id.* at 22. But the Eighth Amendment is only concerned with what Sticht actually knew—not what he *should* have known. Sticht repeatedly avers in sworn statements that he did not know anything about Plaintiff, Williams, or their respective histories with the Bloods before the orientation session attack. *See, e.g.*, ECF No. 103-1 at 2. Although Sticht could access documents describing Plaintiff's history with the Bloods, he had no reason to read them because the DOCCS Office of Movement and Classification was responsible for placing inmates and conducting risk assessments. Sticht testified that he did not learn of Plaintiff's background or his January 16, 2013 verbal altercation with Williams until after the January 23, 2013 attack at the orientation session, at which point Sticht decided to place Plaintiff in protective

8

custody. *Id.* at 12. Nothing in the record rebuts or discredits Sticht's averments. Because it would be impossible for Sticht to disregard a risk that he did not know existed, no reasonable jury could conclude that Sticht was directly liable for an Eighth Amendment violation. Summary Judgment is therefore GRANTED as to Defendant Sticht.

## III. Supervisory Liability

Plaintiff argues that, even if Sticht is not directly liable under Section 1983, he is liable under the statute as a supervisor. Section 1983 imposes liability for conduct that subjects a plaintiff or "causes" him "to be subjected to a deprivation of a right secured by the Constitution and laws." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citing *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976)). There is no *respondeat superior* liability under Section 1983. *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 324 (W.D.N.Y. 1999). Instead, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages" under Section 1983. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d. Cir. 1977). A supervisor is "personally involved" in the deprivation of a plaintiff's Eighth Amendment rights and therefore liable under Section 1983 if he or she (1) participated directly in the alleged constitutional violation, (2) after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[4]

---

[4] The Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), called the doctrine of supervisory liability into question. The Second Circuit has "not yet determined the contours of the supervisory liability test" in the wake of *Iqbal*. *See Rasparado v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014). However, courts within the Second Circuit have reached the consensus that the relevant *Coughlin* category here—whether the supervisor created a policy

9

Fundamentally, for a supervisor to be liable under Section 1983, there must "of course" have "been an underlying constitutional deprivation" by a subordinate, *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999), and a "causal link" between the supervisor's conduct and the violation of the plaintiff's civil rights. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). When a Plaintiff raises an allegation under the third *Colon* factor—that the defendant supervisor maintained a custom or policy under which unconstitutional practices occurred—that policy must be the "moving force" behind a constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 831 (1985). Absent an "affirmative link" between the policy and the "particular constitutional violation" alleged, a policy is too "nebulous" and far "removed from the constitutional violation" to establish supervisory liability. *See id.* at 822. Furthermore, a "single incident" of illegality . . . especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993).

Plaintiff argues that Sticht is liable under the third *Colon* factor of creating or continuing a policy under which unconstitutional practices occurred. Specifically, Sticht's policy "was to impermissibly defer to the determinations of unidentified people in Albany as to whether an inmate was eligible for double-cell housing, and then randomly assign inmates together." ECF No. 102-1 at 6. According to Plaintiff, state regulations required Sticht himself to determine whether Plaintiff was suitable for double-cell housing, but Sticht instead improperly relied on DOCCS Office of Classification and Movement. *Id.* at 19.

---

or custom under which unconstitutional practices occurred—is still sound law. *See, e.g.*, *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N .Y. Jun. 26, 2009); *Joseph v. Fischer*, No. 08 Civ. 2824 (PKC) (AJP), 2009 WL 3321011, at *14 (S.D.N.Y. Aug. 10, 2010).

Sticht correctly argues that state regulations expressly allow him or his "designee" to make that determination. *Id.* (citing 7 N.Y.C.R.R. § 1701.5(a) ("The deputy superintendent of security or designee shall conduct a risk assessment . . .")). As there "are thousands of violent gang members who are incarcerated throughout NYS DOCCS" and "literally hundreds, and even thousands, of pages of records related to each inmate in DOCCS," it would be extraordinarily difficult for Sticht himself to determine inmates' suitability for double-cell housing. ECF No. 103-1 at 3. DOCCS's Classification and Movement Office exists so Sticht and deputy superintendents of security at other prisons can "help assess, to the extent possible, the risks associated with moving inmates among the various DOCCS facilities." *Id.* at 4. There is evidence that Classification and Movement could have more thoroughly vetted Plaintiff for double-bunk housing,[5] but that does not mean that Sticht's reliance on the office was misplaced. Plaintiff also argues that Sticht's policy[6] of "randomly select[ing] inmates to bunk together" once they were cleared for double-cell housing violated state regulations requiring him to "assess the suitability of double-cell inmates to be placed together in the same cell." ECF No. 102-1 at 21. Additionally, Plaintiff argues that he did not timely receive an intake interview. *Id.* at 10.

Even assuming that Sticht maintained deficient policies for pairing cellmates together, his policies are too disconnected from the underlying alleged unconstitutional conduct to render him liable as a supervisor under Section 1983. The alleged underlying constitutional violation in this case is Defendant Johnson's failure to document the verbal altercation between Williams and Plaintiff, but the policies leading to Williams and Plaintiff's pairing as cellmates are several "steps

---

[5] For instance, DOCCS should not have deemed Plaintiff eligible for double bunking in the first place because regulations prohibit individuals weighing over 299 pounds from double cell assignment, and Plaintiff weighed more than 300 pounds when he transferred to Wende. ECF No. 102-1 at 22. Additionally, it appears that DOCCS did not fill out the requisite information sheet documenting its evaluation of Plaintiff for double bunking. *See id.*

[6] It is unclear, but ultimately immaterial, whether DOCCS or Sticht randomly selected inmates to bunk together.

11

removed from" Johnson's own conduct and can hardly be described as the "moving force" behind Johnson's deliberate indifference. *See Tuttle*, 471 U.S. at 819.

To illustrate the notable disconnect between Sticht's policies and the alleged Eighth Amendment violation, the Court deduces Plaintiff's line of reasoning as follows: because Sticht had improper policies for matching cellmates, Williams and Plaintiff were unwisely double bunked, which led to their verbal altercation in which Defendant Johnson intervened but failed to document, which resulted in Plaintiff and Williams attending the same orientation session, which resulted in Williams attacking Plaintiff. It is evident from this strained line of reasoning that the relationship between Sticht's cellmate pairing policies and the alleged underlying constitutional violation—Johnson's deliberate indifference to Plaintiff's safety—is attenuated at best, and a far cry from the "affirmative link" that the Supreme Court demanded in *Tuttle*. Johnson's actions are entirely unrelated to any alleged policies that Sticht had for double bunking cellmates. Moreover, a policy cannot "ordinarily be inferred from a single incident of illegality," and a single incident is all that Plaintiff has alleged. *See Dwares*, 985 F.2d at 100. Summary judgement is therefore GRANTED as to Defendant Sticht.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 95) is GRANTED and Defendants Barrett and Sticht are dismissed from this case. The Clerk of Court is directed to update the caption accordingly.

Defendant Johnson is the sole remaining defendant in this case. The parties are directed to appear on May 25, 2018 at 10 AM to set a date for trial.

IT IS SO ORDERED.

Dated: April 27, 2018
       Rochester, New York

                                                HON. FRANK P. GERACI, JR.
                                                Chief Judge
                                                United States District Court